UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

COPY

- - - - - - - - -x
KEITH C. WYLIE,          |
    Plaintiff,         |        Docket NO.
                |        3:03CV00426 (JCH)
    vs.                |
                |        March 31, 2004
JOHN E. POTTER,          |
Postmaster General,      |
    Defendant.         |
- - - - - - - - -x


## DEPOSITION of KEITH C. WYLIE


Taken before Kristine A. Paradis, LSR #338, a
Court Reporter and Notary Public within and
for the State of Connecticut, pursuant to
Notice and the Federal Rules of Civil
Procedure, at the U.S. Post Office,
50 Brewery Street, Postmaster's Conference
Room, Second Floor, New Haven, Connecticut,
on March 31, 2004, commencing at 10:27 a.m.



US POSTAL SER...
LAW DEPARTMENT

APR 1 5 2004

WINDSOR FIELD OFFICE
WINDSOR CT  06006-0170


FALZARANO COURT REPORTERS
117 N. Saddle Ridge
West Simsbury, CT  06092
860.651.0258

APPEARANCES:

    For the Plaintiff:

        KEITH C. WYLIE, PRO SE
        55 Monroe Street
        New Haven, Connecticut  06516
        203.887.3604


    For the Defendant:

        UNITED STATES POSTAL SERVICE
        8 Griffin Road North
        Windsor, Connecticut  06006-0170
        860.285.7098
            By:  ANTHONY T. RICE, ESQ.
                Special Assistant U.S. Attorney

## S T I P U L A T I O N S

It is stipulated and agreed by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public, before whom this deposition is taken, is waived.

It is further stipulated that any defects in the Notice are waived.

It is further stipulated that the deposition may be signed before any Notary Public.

(Deposition commenced:  10:27 a.m.)


KEITH C. WYLIE, Deponent, of 55 Monroe

Street, New Haven, Connecticut  06516, having

been first duly sworn by the Notary Public,

was examined and testified, on his oath, as

follows:

DIRECT EXAMINATION


BY MR. RICE:.

    Q    Mr. Wylie, would you state your full name for

the record, please.

    A    Keith Cole Wylie.

    Q    And what is your current residential address?

    A    55 Monroe Street, New Haven, Connecticut.

    Q    And are you currently employed, sir?

    A    Yes.

    Q    And where are you employed?

    A    Wal-Mart.

    Q    And what do you do at Wal-Mart?

    A    I am a stock person.

    Q    Okay.  And how long --

    A    Receiving associate.

    Q    And how long have you been working there?

A        Seven months, give or take a couple of days.

Q        And how many hours a week do you typically work?

A        Forty.

Q        And what's your weekly rate or your per-hour rate?

A        Nine -- about 9.75.

Q        Per hour?

A        Yes.

Q        And prior to starting work at Wal-Mart, where was the last place you were employed?

A        Linens N Things.

Q        And where is that?

A        That is located in Milford, Connecticut.

Q        And how long did you work there?

A        Three months.

Q        Okay.  And before that?

A        Before that, none.

Q        Okay.  For the time you last worked for the Postal Service, are those the only two employers you worked for?

A        Yes.

Q        And how much were you making, either an hour or a week at Linens N Things?

A        7.50.

Q      And how many hours a week were you typically working?

A      Forty.

Q      And why the change from Linens N Things to Wal-Mart?

A      A higher rate.

Q      Okay.  Now, my understanding is you last worked for the Postal Service sometime in June of 2001; is that right?

A      I believe so.

Q      I'll get the lawsuit out here.

Tell me when you first went to work for the Postal Service, what year.

A      That was on August 18th of '94.

Q      Okay.  And where did you start at the Postal Service?

A      Brewery Street in New Haven.

Q      And what craft were you in when you started?

A      Mail handling.

Q      And did you continue at Brewery Street through your whole career?

A      We were -- we moved and brought up to Wallingford, the whole establishment.

Q      And did you go to Wallingford as a mail handler also?

A     Yes.

Q     And when you were last working, at the time
you were last employed in Wallingford, what tour were
you working?

A     Tour 1.

Q     Okay.  I'm just going to ask you a few
questions about the claims that were made in this case.
As I understand it -- and you can tell me if I get any
of this wrong.  In this lawsuit, you're claiming you've
been discriminated against on the basis of your gender,
being male; on the basis of your color, being black;
and your race, African-American?

A     Yes.

Q     Is that correct?

A     Yes.

Q     Is there any other basis that I've missed or
are those the three bases for the discrimination
claims?

A     And my disability had certain things to do
with it.

Q     Okay.  Well, let's start with the disability.
What disability are we talking about, sir?

A     I have a seizure disorder.

Q     Okay.  And when was that first diagnosed?

A     In '88 I think my Service was.

Q    And do you know what the specific diagnosis is? Is it just seizure disorder or is there some other name?

A    Epilepsy.

Q    And how long have you suffered from epilepsy?

A    Since 1988.

Q    And was it the result of an accident or trauma?

A    They never found out what it was. They said it was a stressful day in the service.

Q    This was in the military service, I take it?

A    Yes.

Q    What branch of the military were you in?

A    Navy.

Q    And from what years to what years?

A    From '84 to '88.

Q    And I assume you were honorably discharged?

A    Yes.

Q    And was it during the course of your Naval service that this epileptic condition was discovered?

A    Yes.

Q    Did that result in an early discharge?

A    Yes.

Q    Since 1988 until the present, have you received medical attention for your epileptic

condition?

    A    Yes.

    Q    And how often do you receive medical

attention?

    A    How often do I go to the --

    Q    Yeah.

    A    Every three months.

    Q    And is that for a checkup of sorts?

    A    Yes.  Over the course, like to explain to

them how I'm doing and if any seizures occurred.

    Q    Are you taking any medication relative to it?

    A    Yes.

    Q    What do you take?

    A    Lamotrigine

    Q    And how often do you have to take it?

    A    Three times a day.

    Q    And is that, to the best of your

understanding, to prevent seizures from occurring?

    A    Yes.

    Q    And how long have you been on Lamotrigine?

    A    Maybe possibly within a year.

    Q    Okay.

    A    They changed me over.  I was on something

else.

    Q    Dilantin?

A       No, I haven't gotten to that one yet.

Q       Okay.

A       This one was -- I'm not sure what's the name
of it.

Q       Okay.

A       Tegretol.

Q       How often did you have to take the Tegretol?

A       The same, three times a day.

Q       Any difference that you notice between the
two medicines in terms of their impact on you?

A       Yes, I'm not as worn out or tired as I was.
I'm not sleeping over, like missing my sleep time.

Q       The Tegretol used to cause you to be sleepy?

A       Sleepy all the time, yes.

Q       In terms of the seizures themselves, when is
the last time that you had a seizure episode?

A       Three months ago.

Q       And was there anything particular that
triggered it?

A       No, they didn't say anything particular.

Q       Okay.

A       Just another stressful day.

Q       Has your physician classified the seizures as
grand mal seizures, petit mal seizures, has he made
any -- or she made any --

A      Different -- depends on the episode and how the person that observes me doing the seizure would explain to it.  They have mild seizures and what they say very mild seizures and little seizures.  They have them in three different classes.

Q      And what class did the seizures that you experienced fit in?

A      They would be in the middle class, but I have had some that were in the bigger class.

Q      Okay.  Thinking back over, say, the last three years, how often would you estimate that you suffer a seizure?

A      Maybe one every two months.

Q      From what you can determine, it seems to be at least somewhat stress related for you?

A      Yes.

Q      Okay.  When you have a seizure, how long does the seizure typically last?

A      Three to five minutes.

Q      And during that period are you unconscious or are you aware that you're experiencing a seizure?

A      Unconscious.

Q      Okay.  Before the seizure, do you get any warning sign that you're about to experience one?

A      No.  It only happens at sleep time, when I'm

asleep.

Q    Okay.  So, the seizures occur when you're asleep?

A    Yes.

Q    Have they ever occurred during your working day, for instance?

A    No.

Q    In terms of driving an automobile, do you have an operator's license?

A    Yes.

Q    Is there any restriction related to the epilepsy?

A    No.

Q    In terms of where you're working currently and when you worked at Linens N Things, did the seizures interfere with your ability to work?

A    No, because I would -- not since I been on the other medicine.

Q    On the Lamotrigine?

A    Yes.

Q    Before you switched to that, when you were on the Tegretol, did the medication create any problems with your working environment?

A    Yes.  It would make me more sleepy, so it would make me wake up later.

Q     Okay.  So, would that cause to you be late for work or miss work?

A     Yes, late to work or if it was very hard, sometimes I would have seizures and it was a very hard one, it would make me miss work.  The doctor would prescribe me not to go to work.

Q     Okay.  What other effects outside of work does your epileptic condition have?  And by that I mean, how does it impact your life outside of work?

A     It doesn't basically.

Q     Okay.

A     Outside of work.

Q     You feel you generally function well most of the time?

A     Yes.

Q     Okay.  Going back to your time at the Postal Service, Mr. Wylie, I assume since this condition was diagnosed in 1988 you suffered from it during your entire postal career?

A     Yes.

Q     Which would have been '94 to 2001?

A     Yes.

Q     While you were working for the Postal Service, did you experience seizures?

A     Yes.

Q      Were they ever at work?

A      No, never at work.

Q      Okay.  In terms of working for the Postal
Service, how did the epileptic condition impact your
ability to work?

A      As far as working?  It never did.

Q      Other areas of your wife, would it be the
same thing you described now or before you changed
medication, that it would cause you to be excessively
sleepy sometimes?

A      Yes.

Q      Is there any other impact you can think of as
we sit here today that your epileptic condition had on
your life during the time you worked for the Postal
Service?

A      You mean outside of work?

Q      Yes.

A      You're saying?

Q      Yup.

A      Besides not being able to -- I believe it
would slow me down a little bit, as if it -- you know,
not being able to -- I would not go out there and
excessively play basketball or anything like that.

Q      How old are you, sir?

A      Thirty-five -- 37, actually.

Q      Do you have hobbies, playing basketball, running, mountain climbing, anything like that?

A      No.

Q      Mr. Wylie, if I could show you a copy of the report of investigation in the EEO case, which preceded your District Court filing, could you take a look at what's marked as I believe page 173.  And I suggest to you that appears to be a copy of the formal complaint you filled out.  Does that --

A      Yes.

Q      Do you recognize that?

A      Yes.

Q      Okay.  And is that your signature on the bottom?

A      Yes.

Q      Okay.  And in that complaint you named a postal official named Ron Sacco is it --

A      Yes.

Q      -- as the discriminating official and that you had alleged that Mr. Sacco discriminated against you on the basis of your race, color, and your gender being male?

A      Yes.

Q      Is that accurate?  Okay.

Tell me a little bit about when you first

started working for Mr. Sacco and who he is actually.

    A      Okay.  When I first started working at the post office, he was an initial clerk; he wasn't a supervisor.

    Q      Okay.

    A      And this was here at the Brewery Street branch.  I was at a younger age, and so I came to work, I was very flashy as far as jewelry and -- you know. So after -- I didn't know him throughout the first couple of months, and then I happened to meet a female inside the Wallingford branch that I didn't know at the time that he was sort of interested in.  And so he would make several comments to me, you know, as regarding -- because this woman was a Caucasian woman, and my preference happens to be that.

          And he would make certain -- you know, like comments and I would go about my business not paying him any mind.

    Q      Do you remember what the comments were?

    A      Like, leave those white women alone.

    Q      Okay.  Anything else?

    A      Not necessarily.

    Q      Okay.  I'm sorry.  If you could continue. So, at this time Mr. Sacco was a coworker and not a supervisor?

A     Yes, coworker.

Q     Tell me what next happened in terms of the working relationship between you and Mr. Sacco.

A     It wasn't really -- it was only time I saw him was when we would take our break in the cafe and I would sit next to the female and continue my talking and everything.  Other than that, it was no major problem with work or anything because he didn't work with me.

Q     How often did Mr. Sacco make a comment of the type you just described for me to you?

A     It was several times I would say.

Q     More than ten?

A     Yes, because --

Q     I'm sorry.  More than 20?

A     In between -- well, it was like a constant every other day thing.  Like they were -- it wasn't only him, it was --

Q     Other people?

A     -- several people that he was sitting with and they would talk and we would hear them talking, not only me but other people would.  And so it was like -- I'd ignore it so we didn't even try to worry about anything.

Q     Did Mr. Sacco make these comments in a way

that you perceived to be joking or perceived to be serious?

A     I believe it was more of like a -- it was more of like a joking manner, because I mean if he's serious, it would cause a fight or something.

Q     Right.

A     So, it was more like a joking manner with his friends and laughing supposedly.

Q     How did the comments make you feel when you heard them?

A     Well, I didn't really pay him -- I got upset a couple times, and I really didn't -- try not to pay him any mind because of the other people that I mix with, you know.  They were, like, oh, jealousy is this and, you know, don't worry about him and this and that.

Q     Okay.  At some point Mr. Sacco ended up being your supervisor in some capacity.  When did that happen?

A     As we moved to Wallingford, in the course of certain months, he then became my supervisor.

Q     Okay.

A     He went through a program.  He became what is known as a 204-B.

Q     An acting supervisor?

A     Yes.

Q      And did he supervise the unit you actually worked in?

A      Yes.

Q      And I understand you were a mail handler in Wallingford.  Was there a particular unit or place that you worked?

A      The truck terminal.

Q      And Mr. Sacco was a supervisor at the truck terminal?

A      Yes.

Q      Started as an acting supervisor?

A      Acting supervisor out there, yes.

Q      Just let me back up a little bit, Mr. Wylie. In addition to the comments you've testified to a few minutes ago, anything else that Mr. Sacco had done before getting to Wallingford before he was an acting supervisor that you perceived to be either hostile or unfriendly or not appropriate?

A      No.  Outside of the post office or inside, no, he didn't say anything to actually cause a fight.

Q      Okay.

A      You know, to confront me, but he would say things in a manner to his buddies to make big laughs about it and to, you know...

Q      Moving forward, you're now at Wallingford in

the truck terminal area.  When you first got there was
Mr. Sacco a 204-B or did that happen after you got
there?

A      That happened after I got there.

Q      How long in total, if you can estimate, did
you actually work for Mr. Sacco between his acting time
and whatever permanent supervisor time he had?

A      Say possibly a year about.

Q      Was there anybody else that also was your
supervisor during that same period that Mr. Sacco was
supervising you?

A      Yes, there were several other acting
supervisors on his days off.

Q      Do you remember who they were?

A      There was one by the name of Owen Davis.

Q      Okay.

A      There were so many.  I would know their name
if I heard them.

Q      Who was the MDO, the manager on the tour that
you were working if Mr. Sacco was a supervisor?

A      There was one, Mary Wellborn, and I don't
remember -- there were two other male gentlemans.

Q      Okay.  How many people worked in the unit
that you were in that were supervised by Mr. Sacco?

A      I'd say around 15 to 20.

Q      All mail handler craft people?

A      Yes.

Q      As a mail handler in that unit, did you have a specific task within the unit or was it general mail handler duties?

A      My specific task was -- it was loading trucks and I had a coverage job, I had a tow motor coverage.

Q      Okay.

A      And what that meant was when there wasn't enough tow motor drivers by the people that had bid jobs, I had to drive. It was my option to drive or I didn't have no option, I had to drive when there were no more before the people that were on the list.

Q      Okay. So, it was a seniority-based --

A      Yes.

Q      -- situation?

On a typical day, would Mr. Sacco make decisions about what tasks you would do and other mail handlers or was that pretty much a set, established schedule?

A      No, on a day it depends on who was there. But he would start from the seniority people of who wanted the job, and he would go to certain -- everybody and find out what job they wanted from seniority on down.

Q      Now, up to the point that we get to the claims that actually are a part of this lawsuit, while Mr. Sacco was either your acting or permanent supervisor, are you having problems with him?

A      Yes.

Q      Tell me about those.

A      Okay.  He would, like, skip over me in the rank of seniority and give me certain jobs that nobody else wanted.

Q      For example, what kind of jobs?

A      They were driving jobs, but see, there was certain jobs as if you would pull mail out of the linear sorter or you would pull mail off the DBCSs.

Q      Is one of those considered to be better work than the other?

A      Yes.

Q      Which is better and why?

A      The linear sorter would be better, because, I mean, your dispatches are basically at a set rate time. As far as the DBCS, you would have to ride around and, you know, wait for them to push the mail out and then take it, so...

Q      Okay.

A      And you're inside more with the people at a choice of possibly getting into an accident or

something.

Q      Okay.  Did Mr. Sacco ever do anything or say anything that caused you to believe that these assignment decisions were based on your race, your color, or your gender?

A      Did he ever say anything?

Q      Yeah.

A      No, he never said anything.

Q      Okay.  Did he ever do anything that caused you to think that?

A      Yes.

Q      Okay.  Tell me what he did.

A      Well, he would give all of the other mail handlers, even the ones that I were senior to that were of the white race the job that I would ask for.

Q      Did you ever raise this to his attention?

A      Yes.

Q      And what was his response typically?

A      He really didn't have any response, because I would report to the union.

Q      And would the union get involved in this?

A      Yes.  The union would sometimes overrate (sic) his decision.

Q      Did they actually file a grievance on it or would a steward just talk to him?

A       They would talk to him.  After a while they talked to him, and then after coming out of there every single day, they filed a grievance.

Q       How did the grievance finally get resolved, do you know?

A       It went through the first MDO.

Q       Okay.

A       It went through the MDO on our tour, Mary Wellborn.  Then it went to the senior MDO because the union was not happy with it and I was not happy with the results.  So, I went to the senior MDO.

Q       And what happened at that level?

A       At that level it -- we still weren't happy. He was still doing the same thing as if nobody even spoke to him.

Q       Okay.  What happened after the grievance went to the senior MDO level?

A       After it went to the senior, evidently they talked to him or something and he started making it very personal, like it was a very personal vendetta even more than what it was.

Q       Against you?

A       Yes.

Q       And in what way did you perceive that?  What was he doing that caused you to think that?

A     Some days when I knew it was my day to drive,
he would try not to let me drive because that is a
level 5 job.

Q     And as a level 5 job, would you get increased
pay for driving?

A     Yes.

Q     What time frame is this all happening in?
And I guess maybe the best way, if you think about in
this case you first sought EEO counseling I'd suggest
to you back in June 14th of 2001.  Does that sound
about right?

A     When I first?

Q     Yeah.  If I could show you in the file --

A     No.

Q     -- on page 176, there's a counseling request,
and --

          MR. RICE:  Can we go off the record for
          one second.


          (Off-the-record discussion.)


BY MR. RICE:

Q     I'm just showing you the counselor's report,
which I think was probably filled out by Mr. Perednia.

A     Yes.

Q      Date of initial contact with EEO office,
June 14th of 2001 relative to a claim about Mr. Sacco.
Does that sound right?

A      Yes.

Q      Thinking back then to June 14th of 2001, the
incidents you've just described with respect to him
keeping you out of certain driving jobs, when were they
happening?

A      They were happening before then.

Q      How long?  Within six months?

A      No, years before then.

Q      Okay.  By the time you got to filing the EEO
claim that brings us all here today, had that problem
been resolved between Mr. Sacco, the union, and you?

A      It would be on and off.

Q      Okay.  In the, say, six months before
June 14th of 2001, had Mr. Sacco done that again?

A      Yes.

Q      Okay.  How about within the three months
before June 14th of 2001?

A      Yes.

Q      Okay.  Within the six weeks, say?

A      Within the six week of that?

Q      Yeah.  I'm just trying to get a sense of how
close to June 14th of 2001 would have been the last

time he did this to you.

    A    I'm not sure, but it was like an ongoing thing up until.

    Q    Did it ever stop?

    A    When he wasn't there.

    Q    How about in terms of was there ever any official action on the grievance?  Did it ever go to arbitration?

    A    No.  He stopped at one time when we went to -- after not getting the results from the MDOs we went to, the union steward took it to another MDO on a different tour.

    Q    And what happened then?

    A    And then it stopped for a while then.

    Q    Okay.  Now, going forward to -- if I could suggest to you November of 1999, my understanding is that as the result of some proposed disciplinary action, you entered into a last-chance agreement with the Postal Service; is that right?

    A    Yes.

    Q    And I think you have a copy of this file too.

    A    Yes.

    Q    So, I'll probably just, instead of leaning over the table and hanging on your neck, I'll just show you.  In that file, which I will make an exhibit to the

deposition.  What I'll do is after we're finished, I will make a copy of it for the Court Reporter and make it an actual exhibit to the deposition.

But in the file itself, Exhibit 4 on page 47 and going from page 47 up through and including page 49, does that appear to be the last-chance agreement that you signed on November 18th of 1999?

A     Yes.

Q     Okay.  Now, the next document in that file, page 50, is a May 15, 2000 letter of which the subject is step 2 grievance and you are the grievant.  The letter refers to a notice of removal issued on February 28th of 2000.  Do you remember that situation, getting a letter of removal?

A     Yes.

Q     In February of 2000?

A     Yes.

Q     My assumption would be -- and you tell me if I've got this wrong -- that after you got the notice of removal, the union filed a grievance on your behalf?

A     Yes.

Q     Which is this grievance reflected on page 50?

A     Yes.

Q     And this document, page 50 and page 51, appear to be the grievance settlement.

A     Yes.

Q     Okay.  In the course of that settlement, did you have a union representative representing you in the removal process?

A     Yes.

Q     And do you remember who it was.  Was it Mike Stango or was it a steward?

A     Are you asking me who represented me as before the problems or --

Q     No.  Well, I'm sorry, let me back up.  My question wasn't clear.

You had gotten a notice of removal from the Postal Service on February 28th of 2000; is that correct?

A     Yes.

Q     The union official that handled the grievance for you as a result of getting that notice of removal, do you remember who that person was?

A     Yes, it was Mike Stango.

Q     And Mr. Stango, was he the local president or a steward?

A     Yes, he was president.

Q     Okay.  In resolving the grievance that's reflected on page 50 and in entering into this resolution, did Mr. Stango talk to you about what the

terms of the resolution were?  Did he tell you here's what we're going to do?

A    Yes.  He explained to an extent, yes.

Q    And did you understand what the resolution was going to be?

A    Yes.

Q    Okay.  Moving forward -- hold on one second. Actually, moving forward in time but actually backwards in this, on June 18th of 2001, page 42, page 42 and 43 I'd suggest are a letter to you from somebody named Greg Tironne.  Do you remember getting these documents from Mr. Tironne?

A    Yes.

Q    Okay.  And my reading of this is this is a notice that you're being terminated from the Postal Service as the result of an alleged violation of a last-chance agreement.  Is that your understanding --

A    Yes.

Q    -- of what this was?  Okay.

On the second page, page 43, Mr. Wylie, starting with the word "Since November 24, 2000, your record has shown as follows," and there's a list of several dates.  And opposite the list there's various time units and words like late, AL, LWOP, SL, AWOL.  Do you see where I'm referring to?

A    Yes.

Q    On the dates in question, if you can remember, for instance looking the first one, 11/24/2000, right across from it has .38 units late. My understanding is that the Postal Service doesn't keep time in minutes; it keeps it in units?

A    Yes.

Q    Based on a hundred clock sort of?

A    Yes.

Q    So, how late would be 38 units. Twenty minutes, perhaps?

A    Twenty, 25 minutes.

Q    Do you remember on that date, were you late 38 units or 25 minutes, whatever it is?

A    It was possible. I don't remember.

Q    Okay.

A    But it's possible, yes.

Q    As you look down this whole list of dates, Mr. Wylie, looking through them -- and take your time -- are there any of them that you think are inaccurate in terms of either the dates or the allegation of time taken either as annual leave, LWOP, late?

A    Yes. Because for every one of these I requested FMLA.

Q    Okay.  Now, let me back up a little bit then.
When was the first time that you had requested FMLA in
your postal career?

A    In my postal career?

Q    And when I say "requested," my understanding
is there's a certification process.  You bring in some
documentation --

A    Yes.

Q    -- completed by a doctor and you get
certified as being FMLA approved; is that right?

A    Yes.

Q    During your postal career, were there periods
when you were FMLA approved for certain years?

A    Yes.

Q    Okay.  During the period encompassed by these
dates, which I guess would run from 11/24 of 2000 up
until 6/13 of 2001, did you have FMLA approved
certification for that whole period?

A    Yes.

Q    You did.  When you received this notice that
you were being terminated under the last-chance
agreement, what, if anything, did you do in terms of
challenging it?

A    The union wrote out a grievance to it.

Q    Okay.  And how was the grievance processed

and how was it finally resolved, if it was?

    A     It went through the regular grievance process, and they gave me a PDI, predis --

    Q     A predisciplinary interview?

    A     Yeah.

    Q     And what happened at the PDI?  Who was there, first of all?

    A     It was Kevin Duplin and Greg Tironne.

    Q     Who's Mr. Duplin?

    A     He is another supervisor, I think.

    Q     Was Mr. Sacco involved in this termination on June 18th of 2001?

    A     He was not actually involved as -- which one? June of when?

    Q     June 18th of 2001, the letter notifying you of the alleged violation of the last-chance agreement.

    A     No, he wasn't involved in it.  He was one of the supervisors that would sign-off on the FMLA sheets.

    Q     Okay.

    A     And if I did not return them, get them back in a timely manner sometimes.

    Q     So, Mr. Tironne issued you this notice that you were being terminated?

    A     Yes.

    Q     Is that correct?

Did you have the PDI before or after
receiving the notice?

A        Before.

Q        Okay.  And at the PDI it was Mr. Duplin and
Mr. Tironne?

A        Yes.

Q        Was there a union representative for you?

A        Yes.

Q        And do you remember who it was?

A        Ernie Sargent.

Q        And at the PDI, what was the general
discussion between you and the management officials?

A        It was about these, so...

Q        Okay.  Did they ask you about these dates?

A        Yes.  So, actually they did have this before
and after the PDI, because it was a total of maybe --
they gave me one PDI, then they also gave me another
one.

Q        When was the second one?

A        I believe it was in the same week time frame.

Q        Okay.

A        And then they gave me a third one.

Q        If I could show you in the file that you have
in front of you too, Mr. Wylie, starting on page 120
and looking from page 120 through to page 122 and

including that page, there's a series of handwritten questions there.  If you haven't had a chance, would you take a look at them and tell me if those are the questions that you were asked by either Mr. Tironne or Mr. Duplin at the PDI?

A     Yes, they were.

Q     Now, starting on page 123 there's another set of handwritten notes, and they go from 123 through 132. These appear to me to be notes made by one of the management officials at the PDI indicating what your responses were to the questions that you looked at before.  Is that what I'm looking at here are their notes, their PDI notes?

A     Yes.

Q     Have you had a chance to read these at some point?

A     Yes.  I believe I have, yes.

Q     Are the answers that they put down here what you had said or are they inaccurate?

A     They're accurate to the best of my knowledge.

Q     Now, after the second PDI, what happened next in the process, the removal process in June of 2001?

A     After the second, I believe I had another one.  I believe I had three.

Q     Three?

A    Yes.

Q    Were they all on the same subject?

A    Yes.

Q    Okay.  And that's this issue of whether you had violated the last-chance agreement?

A    Yes.

Q    Was Mr. Duplin and Mr. Tironne at all of them?

A    Yes.

Q    Was there any other management official in addition to those two guys?

A    No.

Q    And you and Mr. Sargent obviously were at all of them?

A    Yes.

Q    What happened after the third PDI?  What happened next in the process?

A    They put me -- I went back to work.

Q    Back in your usual assignment?

A    Back in my usual assignment.

Q    And how long did you stay in the assignment?

A    I'm not sure.  Was it a week or maybe two weeks somewhere.  I'm not sure of the date.

Q    What next happened in terms of the removal?  Did you get another notice or a notice?

A    No, I was going on, like, regular, and then that's when Sacco cames in and gives me an AWOL.

Q    Okay.  Tell me what happened on -- is that the June 13, 2001 incident?

A    Yes.

Q    Tell me what happened that date.  You were working tour 1, I believe?

A    Yes.

Q    So, what time would you have come in the night before?

A    Either 10:00 o'clock or 11:00.

Q    And what would your normal quitting time have been then on June 13th?

A    7:30.

Q    You were working as a mail handler?

A    Yes.

Q    In the truck terminal?

A    Yes -- no, on the pouch table.

Q    What's a pouch table?

A    It is 114 and 112 belt.

Q    Okay.  So, it reflects two pieces of a ZIP code that mail gets processed for?

A    Yeah.  Actually, it's a belt and the clerks -- the mail handler is loading the belt, and the clerks are working it, throwing it into sacks.

Q    My understanding generally is you would get a half-hour lunch break and one or two other breaks during the course of a typical tour; is that right?

A    Yes.

Q    Is it one or two other breaks?

A    It's two.

Q    And they're 15-minute breaks?

A    Yes.

Q    On that night, you had taken a lunch break sometime before, say, 6:00 in the morning; is that right?

A    Yes.

Q    Okay.  Tell me what happened with the incident where Mr. Sacco gave you an AWOL notice.

A    Okay.  The incident -- on break time, we had our regular break time, and usually Mr. Sacco comes in there and he tells everybody to leave.  He clears out the whole cafe.  So, everybody leaves.

Q    Is this only mail handlers or clerks or just folks that he supervises?

A    It's usually everybody.

Q    Okay.

A    Yes.

Q    So, he comes in and clears the place out, so to speak?

A    Yes.

Q    What happens next?

A    Okay.  Everybody goes back to work.

Q    Yup.

A    Okay.

Q    In this case, how did it come to be that you received an AWOL notice for whatever you did on that date or you're alleged to have done?

A    Okay.  After returning back to our job assignments, you go and you do what you have to do, your job assignment.

Q    So, did you go back to the pouch table?

A    Yes, pouch table.

Q    What happened next?

A    My supervisor was Sandy Eldridge, and I believe she goes home like about 6:30.  So, she always instructs me, okay, load the belt, load your belt, and because all the other clerks -- the clerks are gone, this is why you have to make sure the belt is fully loaded, which takes a long time.  And once the belt is fully loaded, then on like any given day, if you're finished a little early, then everybody heads to the cafe.

Q    Okay.

A    To get ready to end the tour.

Q      So, is that what happened on June 13th?

A      Yes.

Q      You had been in the cafe; Mr. Sacco herds everybody back; you go back, finished up your assignment on the pouch table; and then headed back to the cafeteria?

A      Yes.

Q      When you got back to the cafeteria, who, if you can recall, was there from your unit, from the people that Mr. Sacco supervised?

A      Well, he was MDO.

Q      Okay.  So, he would have been supervising the whole tour then?

A      Yes.

Q      Okay.  So, who do you remember being in the cafeteria when you came back?

A      When I came back, Jay Romano was there, Margaret Martell was there, and Bob Gurette was there.

Q      Were these folks all sitting at a table or where were they?

A      Yes, they were sitting at a table.

Q      When you came in, what did you do?  Did you go sit with them?

A      I went over there and sat with them.

Q      Okay.  General chatter?

A    Yes, playing cards.  We started playing cards.

Q    Okay.  So, there's the four of you at the table.  Anybody else?

A    Yes, the cafe is actually like full of people.

Q    Okay.

A    It's just like everybody is done with their job, so they're in it.  It's like maybe 50 people in there.

Q    Okay.  This is what time now that you're back in the cafeteria?

A    This is about 7:00, I'd say.  It was in between 7:00 and -- in between 7:00 o'clock and quarter after 7:00.

Q    Okay.  And did your starting and stopping time, was it the same as everybody else's?

A    Yes.

Q    And what time did the tour end?

A    7:30.

Q    So, somewhere between half an hour and 15 minutes before the end of the tour you, and a bunch of other people are back down in the cafeteria?

A    Yes

Q    Okay.  What happens next?

A      Okay.  Now, this there's certain people playing cards; there's certain people sleeping and everything.  So, Mr. Sacco comes up to me and says, here, sign the slip.  You're AWOL.

Q      And the slip we're talking about, is that a 3971, a leave slip?

A      3971, yes.

Q      What do you say to him?

A      And I say, I'm finished with my work.  What do you mean I'm AWOL.

Q      What's he say?

A      And he says, you've been off the working floor and you're just AWOL.

Q      Okay.  Did you sign the slip?

A      No.

Q      Okay.  When you didn't sign the slip what, if anything, did he do with it?

A      He took it.  He took it with him.

Q      Okay.

A      He left and took it with him.

Q      Was there any more conversation between you and him other than what you've just told me?

A      Yes, there was conversation.  I was like, well, look, you know, there's 50,000 other people in here.  Why do you walk up to me and hand me a slip.

Q      And what's he say?

A      And he says because you're the one that's AWOL.

Q      Okay.  Is that the end?  Is there any more conversation at that point?

A      No, basically not that I remember.

Q      He walks away with the slip?

A      Yes.

Q      You haven't signed it?

A      No.

Q      Did he say anything to anybody else sitting at the table with you?

A      He said -- yes, he said something to the female that was at the table.

Q      Is that Ms. Martell?

A      Martell, yes.

Q      What did he say to Ms. Martell?

A      He said something similar to like -- like, I believe she said something like I'm not AWOL or something or something like that to him.  And he said I wasn't talking to you.  That's what he said to her.  I wasn't talking to you.

Q      Okay.  Did he say anything to anybody?  Did he say anything to Mr. Romano?

A      No.

Q      And there was a Mr. Bob --

A      Gurette.

Q      -- Gurette.  Did he say anything to
Mr. Gurette?

A      I don't know if he did or he didn't, because
I was -- at that time I was aggravated with him, and --

Q      Okay.

A      -- I believe I got up and went to the union
office.

Q      Before you went off to the union office,
Mr. Wylie, did you see if he talked to anybody else of
this group of people that were in the cafeteria at this
point, if you can recall?

A      No, I don't recall him talking to anybody
else.

Q      Okay.  You go off to the union office
immediately?

A      Yes.

Q      What happens there?

A      Okay.  I went and told the union that, you
know, there's a whole cafe full of people and he
singled me out, you know.  And it was time to go home,
so there really wasn't much they could do at the time.

Q      Do you know if a grievance was filed as a
result of the incident?

A      Yes, there was.

Q      And how did the grievance end up getting resolved?

A      It didn't.  I was terminated.

Q      Okay.  So, this incident on June 13th, that's the last date, I note, on the notice of termination that they give you, the June 13, 2001 day where there's an AWOL beside it.

A      Yes.

Q      That's the incident we've just been talking about?

A      Yes.

Q      Okay.


            (Off-the-record discussion.)


BY MR. RICE:

Q      The June 13th issue occurs.  You go home from your working tour that day.  When's the next time you were back into work?

A      The next day.

Q      Okay.  And did you continue then to come to work including on June 18th when you got this notice of --

A      Yes.

Q      -- termination?

A      Yes.

Q      Okay.  After the notice of termination,
there's these three PDIs that you've testified to, is
that right, or did they occur in the week --

A      They occurred before.

Q      Okay.  So, sometime in the week between
June 13th and June 18th these three PDIs you talked
about happened?

A      No, actually the PDIs happened before, before
I got the AWOL from Mr. Sacco.  They happened --

Q      Oh, okay.

A      -- before.

Q      So, they'd already happened?

A      They had already happened, yes.

Q      Was there a separate discussion or PDI about
what happened on June 13th?

A      No.

Q      Okay.

A      There wasn't.

Q      So, on June 18th you get this letter saying
the Postal Service claims you violated this last-chance
agreement; we're terminating you?

A      Yes.

Q      If I remember what you told me, the union