then filed a grievance over that?

    A    Yeah.

    Q    And how did that -- I'm sorry if I've asked
you this, but I've forgotten.  Did that grievance ever
go to arbitration or whatever happened to it?

    A    Nothing happened.  It was said that I
violated the last-chance agreement and I was AWOL and
to be terminated immediately.

    Q    After filing the grievance, based on your
getting the termination notice, what's the next thing
that you know the union did to fight the termination?

    A    They told me that I would have -- I believe
they told me I had -- I would have to contact EEO,
because in the last-chance agreement, it says that I
cannot grieve it.

    Q    Okay.  So, the last-chance agreement itself
says, in effect, you waive your appeal rights if they
claim there's a violation?

    A    Yes.

    Q    Words to that effect?

    A    Something like that.

    Q    Now, going back to the -- there's a
last-chance agreement which you'd signed in November of
1999.  Then there was this subsequent removal in May of
2000 which resulted in this May 15, 2000 kind of

amendment to the last-chance agreement?

     A     Yes.

     Q     And my understanding of the amendment -- you

correct me if I get this wrong, the amendment to the

last-chance agreement basically added 80 days into the

last-chance agreement?

     A     Yes.

     Q     Okay.  Now, just going back, if I could,

Mr. Wylie, to page -- I believe it's page 43.

     A     Yes.

     Q     And these dates that you had talked about,

you said they were -- if I use the term FMLA protected

dates, is that accurate?

     A     Yes.

     Q     Now, the last date was not part of a PDI.

Were the other dates starting from 11/24 going down to

6/11, were they discussed?

     A     Yes.

     Q     In the PDI, did you raise the issue of, Hey,

this was protected time?

     A     Yes.

     Q     What was the response, if any, from

management on that?

     A     The response was they were going to check

into it, so they say.

Q       Okay.  But did you ever hear anything back about what they might have determined after they checked into it?

A       But then they returned me back to work.

Q       Did they ever get back to you and say, Hey, you're right or you're wrong about whether it was FMLA protected?

A       No, they gave me another PDI.  That's when they followed it up with another PDI.

Q       Did the issue of your FMLA protected time come up in the second PDI?

A       The issue came up, but they went over the same thing as in the other PDI.

Q       Was it your understanding that what was happening here that in the first PDI they say you're in violation or you're out late --

A       Yes.

Q       -- whatever, on these dates and you say no, this is protected time.  Do they then kind of take a time-out to say, okay, let's see what --

A       Yeah.

Q       -- if this is protected?

When they come back, they've now looked into it, and that's why we're having a second PDI; is that what you think happened?

A     Yes.

Q     How come the third one?  I'm just trying to
get a sense of why the third one.

A     I don't know.  Because the dates were went
over again, and they're still calculating.  They're
like, you know, when 80 days add on, he's not violated,
so we're going to have to get back to him again, sort
of like.

Q     Okay.  So, that's all happened by the time
June 13th rolls around and you have this incident with
Mr. Sacco?

A     Yes.

Q     The 3971 form that he wanted you to sign, at
some point did Mr. Tironne ever get involved in this
part of it?

A     Yes.

Q     What was Mr. Tironne's role in the June 13
incident or whatever happened after the June 13
incident?

A     Well, Mr. Tironne didn't know what was going
on.  He had no idea what was going on, and it was like
he didn't have any part in it.  What had happened was
Mr. Sacco gave him the 3971 and says, Here, sign this.
And him, as a supervisor, I suppose he has to sign it
with no questions asked.

Q       Did you happen to see this or is this just what you think happened?

A       This is what I think happened.

Q       Okay.  Now --

A       And this is what the union had told me.

Q       Now, my understanding is there are two separate incidents that were actually investigated in the EEO complaint.  One is the June 13th incident where Mr. Sacco charged you with being AWOL?

A       Yes.

Q       That's one incident.  The second is the June 18th issuance of the notice of termination.  That's what I understand from the claim to be the two issues in the case.  Does that sound -- what I'm looking at is page 168.  There's a letter accepting the complaint and the bottom paragraph on page 168 says, Here's the issues we're investigating.

A       168?

Q       Yes, sir.

A       The complaint claims June 13th.

Q       Yeah.  And I guess maybe what I'm saying is this paragraph says that -- the complaint says that you were discriminated against on the basis of your race, your color, and your sex, when, first, on June 13th, Mr. Sacco charged you with being AWOL; and secondly, on

June 18th, when you were issued this notice of termination based on a violation of the last-chance agreement.  Those are the two claims that we're talking about here, is that right, or is there something else that I'm missing?

A     I'm believing that the two claims were the claim -- I know what claim one is.  Claim 2 would be when I was charged with the AWOL.

Q     Okay.  Well --

A     And the other claim was when I was charged with all of the other ones.

Q     Okay.  That's fine.  I think we're saying the same thing.

A     Yes.

Q     Let's just focus for a minute on the AWOL incident, the June 13th incident with Mr. Sacco.  What is it about what happened in that incident that causes you to believe that Mr. Sacco did this -- when I say "did this," accused you of being AWOL based on the fact that you're a male?

A     Okay.  Well, he has had a problem with me for some time, a long time.

Q     And this goes back to the things you testified a little earlier to?

A     Yeah.  And I've also noticed throughout the

time he has a problem with other black males.

Q     Okay.  Let me ask the question this way:
Recognizing that the claim is broken down into three
parts, your race, your color, and your gender, what is
it about your gender particularly?  On this day, on the
day in question, June 13th, during this incident, did
he treat some woman, whether she's black, white,
Hispanic, or any other race, did he treat some woman
better than you in terms of how he treated you in this
incident?

A     Yes.

Q     And who is that?

A     That was Margaret.

Q     Ms. Martell?

A     Yes.

Q     And tell me, first of all, how Margaret got
treated better; and then second, if you know, why.

A     Well, she didn't receive an AWOL.

Q     Okay.  And how do you know that?

A     Through the grievance.

Q     Okay.

A     I mean, through the union.

Q     And is it your belief that she should have
been AWOL'd?

A     It's my belief that none of us should have

been AWOL'd, but if he was going to issue one AWOL, everybody there should have been AWOL.

Q    Okay.  Do you know if Ms. Martell was on what I would call a legitimate break, one of her 15-minute breaks that day at that time?

A    Basically, yes, because of the department she works in.

Q    Okay.  So, at the table of the people you mentioned, which I think was you, Ms. Martell, Mr. Romano and Mr. Gurette, four people --

A    Yes.

Q    -- were any of those folks -- well, strike this.

On June 13th of 2001, by the time you came back to the cafeteria the second time when you had gotten this notice, had you taken your two 15-minute breaks during that night already?

A    Yes.

Q    The rest of the folks sitting at the table with you, if, you know had they taken their 15 minute breaks already?

A    I know that Jay Romano did.

Q    Okay.  So, it was Jay?

A    I know that Jay Romano did.

Q    So, he was out of breaks, so to speak?

A    Yes.

Q    So, if you were out of breaks, Mr. Romano, how about Ms. Martell?

A    Yes, she was out of breaks also.

Q    How about Mr. Gurette?

A    Yes, he was out of breaks.

Q    So, all four of you folks would be in exactly the same situation is what you're saying?  They had used up their breaks; you had used up your breaks; is that right?

A    Yes.

Q    But the only one that got tagged with the AWOL was you?

A    Well, I heard through the union that Bob Gurette had got an AWOL.

Q    Is Mr. Gurette African-American, white?

A    He's white.

Q    It's your understanding Ms. Martell did not get one?

A    She did not.

Q    Any understanding of why she didn't get one?

A    Because she told Mr. Sacco that she was on a break.

Q    Okay.  Was that a lie, do you know?

A    I believe it to be a lie.

Q      Okay.  Did Mr. Sacco know it was a lie?

A      No.  He had -- well...

Q      Mr. Romano, he didn't get AWOL'd?

A      Yeah.  No, he didn't get AWOL.

Q      So, is it the fact now -- and again, I'm just trying to -- because what I'll do is I'll get to all of the categories, but just with respect to the gender issue -- and if I get this wrong, tell me -- it's your belief that Ms. Martell got treated better than you and you as a male, she as a female, she gets treated better, and that's the basis of the gender claim?

A      Yes.

Q      Okay.  Anything else on the gender part or have I pretty much covered it?

A      Yes.

Q      Color and race.  Let's get down to that. It's your belief that Mr. Sacco issued you the AWOL notice based on your color; is that correct?

A      Yes.

Q      Tell me in your own words what causes you to believe that.

A      From the discrimination he held since I've known him, basically.

Q      So, the earlier incidents you've talked about today where he made comments about you talking to white

female coemployees?

A    Yes.

Q    Let me back up to those for a second,
Mr. Wylie.  Besides those incidents, were there any
other incidents with Mr. Sacco where you believe your
race played a part in how he acted towards you?  And
you talked a little bit about the seniority issues --

A    Yes.

Q    -- and when you would be driving and not, but
in addition to those things you've told me already, is
there anything else he had done in the past that causes
you to think that he was hostile toward you or bore you
some ill will based on you being African-American or
black?

A    Yes, because of a lot of problems he had with
other black males.

Q    Was Mr. Sacco reputed or was there some
feeling that he didn't like black males?

A    Yes, definitely.

Q    And do you know where that came from, what
caused people to believe that?

A    Well, it was because of the way he would talk
to the black crowd as opposed to talking to the white
crowd.

Q    If you know, how did he treat black females?

A    I never experienced that, none of that.  I was never there to experience any of it.  But I have heard several things.

Q    And what did you hear?

A    I have heard that, you know, there was some black females that he didn't like.

Q    Okay.  Now, on the evening in question or the morning in question, I guess, because it's 6:00 o'clock in the morning or 7:00 o'clock in the morning now, you're sitting at a table with the people you've talked about several times already.  Are you the only African-American or black American at the table?

A    Yes.

Q    Okay.  And the people that you think got treated better would be then Mr. Romano, Ms. Martell, and Mr.  Gurette; is that right?

A    Yes.

Q    And those folks are all white?

A    Yes.

Q    So, just again to make sure I get this right, it's fact that you as the only African-American or black American at the table was the only one to get this AWOL slip?

A    I was actually the only one that was handed one.

Q      Okay.

A      The other -- Bob Gurette was given one.

Q      Later?

A      Yes.

Q      Is there anything else about what Mr. Sacco did on that day in terms of your belief that he discriminated against you based on race or color that you haven't told me?

A      Yes.  Because there were other white people in the cafe that I know didn't belong in there, as we say, but I mean -- or they were finished with their work and they went in there.

Q      So, they would have been similarly situated to you?

A      In the same situation as me, as I was.

Q      And do you know if anything happened to them?

A      Nothing.

Q      Who were some of the people you're thinking about, Mr. Wylie?

A      There was a mail handler named Tommy Scalzo. He was in there.

Q      Scalzo?

A      Yes.

Q      Okay.  And who else that you can think of?

A      That was only it, amongst Jay Romano that I

can remember right now.

Q       Is it your understanding that Mr. Scalzo --
is that S-c-a-l-z-o?

A       Yes.

Q       Is that a fair shot at it?

A       Yes.

Q       Is it your understanding that Mr. Scalzo was
out of breaks too, so to speak?

A       Yes.

Q       Do you know if Mr. Sacco knew that?

A       Yes, he knew it.

Q       And how would he know it?

A       Because these are the same people that are in
there every day at this time.

Q       And is this the usual custom of people?

A       Yes.

Q       To gather at the end of the tour?

A       Usual routine, yes.

Q       And is this custom kind of created by the
fact that at a certain point in the tour we're out of
work?

A       We're out of work, yes.

Q       Or out of work to do, if I might?

A       Yes.  finished with your work; go to the
cafe.

Q    Okay.  Is there anything else that you haven't told me yet today that causes you to believe that your race or color was the reason that Mr. Sacco did what he did on June 13th?

A    Well, no.  I also believe it because after having all the PDIs, they weren't able to terminate me because of the FMLA protected.

Q    Okay.  So, tell me how that plays into this.

A    So, with all the PDIs that I had, if they were able to terminate me, they would have terminated me after the first PDI.  Then after the second one or after the third.  Each one of those ones I returned to work.

Now, after there was nothing to be done with that, what, a day or two later, Sacco comes in there and writes me out an AWOL.

Q    So, is it your belief that Mr. Sacco did this to enable some other postal official, I guess Mr. Tironne who signed the letter, to terminate you?

A    Yes.  To put -- well, yes, to put me over the top, so to speak.

Q    So to speak?

A    Yes.

Q    What causes you to think that, Mr. Wylie?

A    Because I believe that Ron Sacco, they went

over this thing with Mr. Sacco.  They talked to him and he knew about the PDIs.

Q     Okay.  So, it's your belief he would have had some knowledge about what had happened in these PDIs?

A     Yes.

Q     And that what your status was or what they were thinking; is that right?

A     Yes.

Q     So -- and again, just so I make sure I understand, what you're saying then is that Mr. Sacco essentially falsely accused you of being AWOL on June 13th to create one more violation that would push --

A     The violation that was needed --

Q     -- this thing right over top?

A     The violation that was needed because the other violations were protected.

Q     Were not sufficient?

A     Were not protected, sufficient, true.  And this one would be the one that would put me over the top.

Q     Okay.  Now, you've told me what you think happened.  What causes you to think that, though?  Is it something you've heard, something you've seen, just your belief?  Tell me why it is you've come to this

conclusion.

A    Well, because of the union were investigating
and they seemed to found out -- the union steward
seemed to found out that this was going around the
building.

Q    Okay.  Who was the union steward we're
talking about?

A    Ernie Sargent.

Q    And what did Ernie tell you relative to this
issue?

A    He actually told me the same thing, you know,
as if, you know, your 80 days added onto has, you know,
proved that these were -- these FMLA charges and these
were not efficient (sic).  That's why you were returned
back to work.  And then after them getting with labor
relations and Mr. Sacco, you know, there was no way
anything else could happen.  And then Sacco gives me
this AWOL.

Q    Okay.  Did Ernie Sargent tell you what his
source of information was?

A    No.

Q    Just going back to the dates that we had
talked about on page 42 -- and I do apologize for
dragging you back there.  43, I'm sorry, Mr. Wylie, and
you may have answered this, and if you have, I do

apologize for asking you again.  I understand that what you're saying is that all of those dates or at least up through 6/11/01 were absences or late or otherwise protected by your FMLA status, correct?

A      Yes.

Q      Okay.  Putting aside the FMLA status, are the time units or the hours alleged generally accurate?

A      I believe so.

Q      Okay.  Thank you.

Is there anything that you haven't told me yet today about why you think your color, your race, or your gender were the reason that you got the AWOL notice on June 13th?  I mean, is there anything I've missed so far?

A      Yes, because, like, this wasn't the first time that Mr. Sacco has tried to AWOL me.

Q      Okay.  Tell me about previous times.  When's the last time before June 13th he'd given you an AWOL or tried to give you an AWOL.

A      Okay.  There was one incident he tried to give me an AWOL where I was working on the pouch table.

Q      Do you remember when this was?

A      No.

Q      Was it within --

A      Not the exact date.

Q      Would it have been within six months of June 13th?

A      I'm not even sure of that.

Q      Okay.  More than six months maybe?

A      He was an MDO, so I believe it would have been within six months.

Q      Okay.  Tell me what happened.

A      Okay.  I was assigned to the pouching operation, because I had got a new job, a new bid job, okay.  Now, I was on the belt, loading the belt, and it was something about he was paging me to come to the truck terminal.  That's what his version of it, what I heard.  And I never showed up there.  So, without not showing up there, he assumed that I was not in the building, I was somewhere maybe in the cafe or somewhere not where I was supposed to be.

But when he wrote the AWOL slip or whatever, the union steward was working right on the side of me, and the union steward was there to testify that I was right there all along doing what I was supposed to be doing.

Q      So, I take it you didn't get any discipline out of that situation?

A      No.

Q      Were there other times that Mr. Sacco had

accused you of being AWOL other than the two we've
talked about here?

    A    No.

    Q    Anything else at all that you can think of
that causes you to believe that your race, gender, or
color was the reason Mr. Sacco tried to give you this
AWOL notice on June 13th?

    A    Well, yes.  Several times Mr. Sacco has tried
to pull me off -- like I said, pull me off of a level 5
job to go do a level 4 job.  He did it a couple times,
and when I complained to the union, they explained that
it couldn't be done.  This is a higher paying job.
Once you're on it, you know, you're entitled to it.

        So, he has several times waited for me to
clean up a certain area, you know, you clean up, you're
doing a big push, and then you -- finally you have
time, you say, okay, well, now I can take it a little
easy because I'm caught up.  And he would come to me
and tell me that he found somebody more seniority than
me to take over that job.  And there is a rule within
the post office that I believe that once you're on a
job for an hour or so, then you're supposed to continue
doing that job or you're supposed to continue with the
level 5 pay.

    Q    Is it your belief, Mr. Wylie, that Mr. Sacco

didn't like you or treated you the way he did because
of your race or your color or -- or, and that he just
didn't like you?

 A  I believe it was because of my race, my
color.

 Q  Okay.  Do you have any sense of whether he
liked you one way or the other?

 A  I believe he didn't like me either anyway.

 Q  Okay.  As a person?

 A  Yes.

 Q  Putting aside whatever race or color you
happened to be, just as Keith Wylie?

 A  Well, I mean, I don't think that I'm a bad
person.  I don't think that, you know -- because of
what I seen, it seems like every problem he has, it
appears to be with black men.

 Q  Okay.

 A  And every time the union always specifies
that I was not alone with this problem, you know.

 Q  Okay.  Now, had you, prior to filing this EEO
complaint, the one that gets us all here today, had you
filed prior EEO complaints?

 A  No, I'd never filed an EEO.

 Q  Okay.  Grievances from time to time I gather?

 A  Yes, grievances with and telling the union

all the time.

Q      Okay.

A      I never filed with EEO.

Q      Okay.  Let's move forward now to the
June 18th termination, which is actually the second
half of the complaint.  I'm going to ask you kind of
the same series of questions about -- it's your
contention that you ended up getting terminated by the
Postal Service on June 18th of 2001 because of your
gender, male, because of your race, and because of your
color.  Is that right?

A      Yes, I would say.

Q      With respect to your gender, Mr. Wylie, tell
me why you think your gender played a part in the
decision to ultimately terminate you on June 18th of
2001.

A      Because of the AWOL that Ron Sacco gave me or
his discrimination.

Q      So, what you're saying -- and I think this is
what you're saying, but if I have it wrong tell me --
the termination is really the result of the June 13th
incident and that is tainted by gender discrimination?

A      Yes.

Q      So, the June 18th incident is not really
separate; it's more the final result, something along

that line?

    A     What I'm actually saying is I'm saying that they didn't terminate me because of my color or gender or anything.  What I'm saying is I received the AWOL because of discrimination to my color and my gender.

    Q     And the AWOL then caused the termination?

    A     The AWOL caused the termination, yes.

    Q     So, the decision to terminate you then -- again, if I got what you said -- is not the result of gender, race, or color; it's the result of the June 13th incident --

    A     Yes.

    Q     -- which you say is a result of gender, race, and color.  Is that accurate?

    A     Yes.

    Q     Okay.  And if I don't get it right, tell me.  I mean, I want to make sure I don't -- I don't mean to put words in your mouth; I just want to make sure I understand it.

    A     Yes.

    Q     Is that an accurate assessment of the position?

    A     Yes.

    Q     Now, have you had a chance -- and I suspect you probably have, but let me ask you on the record.

When you got this copy of the investigation into the
EEO complaint, did you have a chance to read
Mr. Sacco's statement at all?

    A    Yes.

    Q    And let me turn to it, if we could.

            MR. RICE:  Can we go off the record for
        a second.


            (Off-the-record discussion.)


BY MR. RICE:

    Q    If I could turn you to page 23 of the
investigation file.

            MR. RICE:  Can we go off the record for
        one more second.


            (Off-the-record discussion.)


BY MR. RICE:

    Q    Mr. Wylie, looking at Mr. Sacco's affidavit
in your EEO case, which is on page 23 of the
investigation, which is going to be Exhibit 1 in this
case, have you had a chance to read this?

    A    Yes.

    Q    As you read it, is there anything in it that

strikes you as, you know, for lack of a better word, a lie? Is Mr. Sacco (pronounced SAK-O) lying or Sacco (pronounced SOCK-O), if I'm pronouncing his name wrong, lying in this affidavit?

A    Okay.

Q    And again, take your time.

A    Yes. It says when he was supposed to be in his assigned area.

Q    And it's your position you were not supposed to be in your assigned area?

A    Yes. After I was finished with my work, you know, why am I supposed to be in my assigned area if everything is all finished. And it has been a past practice with everybody that after you're finished work, you go into the locker room or you go to the cafe and you get ready to leave.

Q    Just so the record is kind of clear, AWOL, I think -- sometimes I think of in terms of being gone for a whole day. What Mr. Sacco was saying here was you weren't where you were supposed to be at a particular time; therefore, you're AWOL. Is that what he's doing?

A    Yes, I believe so.

Q    Okay. Is there anything else in that statement as you read it that you believe is a lie?

A      Yes.  It says I handed the complainant a PS Form 3971 because I was the one who filled out the 3971s.  Okay.  From what I understand, all of the other black males that got them, he filled them out too.  So, why was I the only one handed one and everybody else was given to their supervisor?

Q      Okay.  Anything else in there as you go through it?

A      Okay.  Yes.  It says some were on their breaks.  I imagine that some maybe were on their breaks, some of the other people that I didn't know were, but the several employees that I was sitting with and the ones that I knew of weren't on their break.

Q      Anything else, Mr. Wylie, as you look through it?

A      No.

Q      Okay.  Well, if something does occur to you, you know, feel free to, you know, interrupt me later.

Let me ask you a couple of questions now about after you left the Postal Service.  My understanding from the Form 50 in here on page 41 is the last day in pay status for the Postal Service you had was June 22 of 2001.  That's on page 41.  There's a box right at the bottom of the 50, under remarks it says last day in pay status.

A        Okay.  Yes.

Q        Does that sound about right that that's the last day you actually got paid for?

A        6/22, yes.

Q        It's about four days after the notice of removal?

A        Yes.

Q        In the period between 6/22/2001 and the time you went to work for Linens N Things, I understand from your earlier testimony you were not working; is that right?

A        No.

Q        How long a time frame was that?

A        I believe that was around maybe two years.

Q        During that period did you apply for unemployment compensation?

A        Yes.

Q        Did you receive it?

A        Yes.

Q        And how long did the period of compensation continue?

A        Of unemployment?

Q        Yes.

A        It could have been -- I believe it was maybe five months or -- it was whatever time you're allowed.

That's what it was.

Q      So, whatever the statute in Connecticut would give you for unemployment, you got it all?

A      Yes.

Q      Was there a hearing held, do you know?

A      Yes.

Q      Did anybody from the Postal Service show up at it?

A      Yes.

Q      Was it Mr. Sacco, do you remember, or Mr. Tironne?

A      No.

Q      After unemployment ran out, that would have left you about 18 more months before you started working again for Linens N Things.

A      Yeah.

Q      What were you doing to survive in terms of financial resources?

A      I was getting disability pay.

Q      Where was that coming from?

A      From my disability.

Q      From the Service?

A      Yes, Service connected.

Q      And I assume you still get that?

A      Yes.

Q    And how much a month is that?

A    That is -- now, it's 200 a month.

Q    And do you know what percent disability rating you're currently carrying?

A    30 percent.

Q    In addition to the Service-connected disability benefit and the unemployment, what other sources of income, if any, did you have until you started working for Linens N Things?

A    Well, my sister was taking care of me and I had a girlfriend that was working in a good job.

Q    During the period between June 22 of 2001 and when you started working at Linens N Things, what jobs, if any, did you apply for?

A    I applied for several jobs that was open.  I was looking for basically anything that was open.

Q    And what jobs and where were they, just as you can best remember them?

A    They were at grocery stores, on like -- stores where I was able to use muscle or, you know, stuff like that, stock.

Q    So, manual labor positions?

A    Manual labor, yes.

Q    Let me ask you a little bit about your educational background, Mr. Wylie.  Did you graduate

from high school?

    A     Yes.

    Q     What year?

    A     '84.

    Q     And you were in the military?

    A     Yes.

    Q     And in the military, did you receive specialized training of any kind?

    A     Yes.

    Q     What kind?

    A     Jet engine mechanic.

    Q     Oh, okay.  Have you, since you were out of the military, practiced as a jet engine mechanic?

    A     No.

    Q     Any particular reason?

    A     Well, I didn't really get far in that trade, so I mean --

    Q     Because your Naval career was interrupted?

    A     Yes.  And basically, with the little bit of training I had, you have to have a certain license before you can even go near a jet.

    Q     Okay.  In addition to the training you got in the military, have you had any college courses, technical school courses, anything post high school?

    A     No.

Q      Okay.  So, the first successful job application then was the Linens N Things job?

A      Yes.  Well, then before I had time off because after the post office I was having seizures like crazy.

Q      So, your seizure situation had worsened?

A      Seizure situation had worsened bad, so I really wasn't fit to go to work anyway.  I wasn't really trying to.

Q      So, by the time you applied for the job at Linens N Things, I assume your seizure situation had stabilized?

A      Had slowed down, yes.

Q      As a result of being terminated in terms of damages, I assume you would be claiming some lost wages?

A      Yes.

Q      The difference between what you have made since you've been gone and what you would have made had you stayed, generally speaking?

A      Yes.

Q      I assume annual leave benefits?

A      Yes.

Q      Do you get any vacation or sick leave at Linens N Things or did you and do you get any at

Wal-Mart?

A    I just started getting, what is that, vacation time.

Q    And how much vacation time do you get at Wal-Mart?  What is their plan?

A    I don't know, but I've been there for, let's say seven months, and I have four hours.

Q    So, it builds up eventually?

A    Yeah, four to six hours, so not good at all.

Q    How about health insurance, did you have health insurance when you were with the Postal Service?

A    No, because I have health insurance with the VA.

Q    Okay.  Life insurance?

A    Just what the VA offers me.

Q    Okay.  As a result of being terminated, have you sought any emotional or psychological counseling or treatment?

A    Just for my seizures.  My seizure got --

Q    Just your medical condition?

A    My seizures got really bad and, you know, they upped my medicine and then they finally brought it back down.

            MR. RICE:  Give me one second.  I might

            be finished.

(Pause.)

BY MR. RICE:

Q    Okay.  Mr. Wylie, is there anything that you
haven't told me that you believe other -- and you've
testified to a great number of things this morning.
But is there anything else you want to testify to
relative to why you believe that you were, number 1,
AWOL'd on June 16th of 2001, and number 2, eventually
terminated on June 18th, based on gender, race, or
color?

A    Not exactly, but I would also like to bring
that -- on the dates that they said that I were not --
I was late and not there.

Q    Yup.

A    And my FMLA was on file and the MDOs as well
as supervisors knew that I had a seizure condition.

Q    How did they know?

A    Because of the several FMLA papers they saw
before.

Q    Okay.  So, typically -- well, let's deal with
Mr. Sacco.  Had Mr. Sacco been someone you had given
your FMLA certification material to?

A    Yes.

Q    And how many times do you think you did that

with Mr. Sacco?

    A    How many papers?  He requested them, like, from me more often than he requested them from anybody else.  It was several FMLA papers I handed in to him. When I was living with my baby's mother during the first year of my post office career, I gave them my seizure one and I gave them another one for my son, because he had cerebral palsy.

    Q    I'm sorry to hear that.

    A    And so they all knew about it.  And in fact, one day what happened, there was a snowstorm and one of the parking lots were closed down.  And I have a handicap sticker to my car.  So, there was no spots left.  I parked in the handicapped zone.  So, I got a page from Ron Sacco and Mary Wellborn telling me to move my car or I was in violation to get a letter of warning.  And I asked them how can I get a letter of warning when this handicap sticker goes to my car?

        And so then out of the blue one of them said, well, how does he have a handicapped sticker anyway? And Mary Wellborn answered, He has one for his son.

    Q    Let me ask you this, Mr. Wylie.  Do you think that Mr. Sacco gave you the AWOL slip or attempted to AWOL you on June 13, 2001 because of your epilepsy condition?

A    No.

Q    Do you think that you ultimately got terminated five days later because of the epilepsy condition?

A    No, not because of the condition.  No, I wouldn't say that.

Q    Is there anything else you'd like to say while we're on the record?

A    No.  I don't believe that -- I would like to say that I don't believe that it was because of my condition, but I believe it was the fact also that they didn't believe that I had a seizure disorder, even though all the paperwork was in their face and everything.  I constantly sometimes got disapproved by Ron Sacco somehow.  And the evidence, it's right there in their face signed by approved doctors.

Q    Okay.  Disapproved for FMLA certification?

A    Yes.

Q    How many times did Mr. Sacco disapprove you for such certification?

A    There were several times it was disapproved. But then because I -- because it took them months at a time to return 3972s, the union asked why were they disapproved?  And if you didn't feel that his documentation was sufficient, why didn't you bring the

slip back in enough time for him to adequately get more information if you need it.

Q    To the best of your knowledge, your belief, though, is that on the dates that are cited in the notice of removal or the notice of violation, those dates were covered by FMLA protection; is that correct?

A    Yes.

Q    Okay.  Is there anything else you'd like to say while we're on the record?

A    You mean as far as with me and Mr. Sacco?

Q    Sure.

A    Okay.  There was several incidents that I reported to the union that when I filed for the bid job on the pouch table and I won it, I had left a DBCS job. So, my new job was -- it was the DBCS with pouch table coverage.  And you're always supposed to fill your coverage job first.

Several times Ron Sacco would send somebody else over there, and I would have to go to the other job.  And it wasn't like, you know, either one of us was no more qualified to do the job than the other one, I believe it was just out of spite.

Q    How long ago or how long before, say, June 13th would those things have happened?

A    Those things would happen within -- I believe

it would have been within the six-month frame.

Q    Okay.

A    And okay, I remember several times, though, he would -- like I said this already, he would skip over me in the level 5 job. And then the union would step in and resolve that.

Okay. All right. Yes, there was one incident when I filed for my disability. I went to him and explained to him that I had took an extra one of my medicine because I was feeling kind of, you know, kind of groggy like a seizure was coming on or something. So, I took an extra one of my medicine, and he was the -- he was supervising the -- actually, he was MDO'g, supervising the tow motor situation. And I asked him -- I told him the situation, that I needed to get off the forklift because I was feeling drowsy and I didn't want to get into an accident or anything.

Q    How long before the June 13th incident would that have happened?

A    I don't even know how long that was.

Q    Okay.

A    But then two and a half hours later the union stepped in. The union had been going at it with him, and after the union stepped in two hours later, then he finally got somebody to replace me. But as in before,

he had plenty of people to replace me then when I didn't have a problem.

Q     With respect to the disability issue, Mr. Wylie, my review of the record, it looks like the first time you raised it in this litigation is in the District Court complaint; is that right?  Because it's not contained on the formal complaint.

A     Yes, I really haven't -- I just really haven't really believed that I was actually, you know, discriminated of my disability.  I believe that my disability -- I was discriminated of because they did not accept the fact that I had this disability.  And my paperwork was all legit for it and they were acting like it wasn't even -- and I was like -- it wasn't even happening.

Q     Okay.  In terms of being late for work, say, on one of the days that's cited in the termination notice, is it your contention that the medication would -- taking the medication would cause you to be late?

A     Yes.

Q     Because you would oversleep; is that --

A     Oversleep, yes, or the medication would make me more drowsier and I wouldn't have the energy to actually jump up and put on my clothes as to sometimes

when the medication was already passed through my system I would be able to.

    Q    Going back to page 43, in the period from November 24 of 2000 up to June 11 of 2001, were you living at the same address during that whole period or had you moved?

    A    No, because I -- wait a minute.  Wait a minute.  After I was --

    Q    Yeah, starting in November of 2000 and then up through just a couple of days before the AWOL incident, were you living in the same place or had you moved during those periods, if you can recall?

    A    I believe I was -- I believe I was -- wait a minute.  As to opposed of where I was when I first started, you mean?

    Q    Well, your Form 50 on the day of your termination or thereabouts, a couple of months after your termination listed you at 80 Bristol Street, New Haven?

    A    Yes.

    Q    How long had you lived there?

    A    That's my mother's house, so that's been with me all my life until --

    Q    So, that may be an address of record kind of?

    A    Yes.

Q       Well, I guess my question is:  During the period from November of 2000 up through June of 2001, if it was more than one place, how close were to you the plant?  How long would it take you to get to work?

A       Maybe 20, 25 minutes.

Q       Okay.  And obviously you had to drive to get there?

A       Yes.

Q       You testified before that your license is not restricted based on your epileptic condition; is that right?

A       Yes.

                MR. RICE:  I don't think I have anything
        else.  Anything else that you have?

                Can we go off the record for one second.


                (Off-the-record discussion.)


BY MR. RICE:

Q       Is there anything else you have while we're on the record?

A       Just several things that I would like to say that --

Q       Sure.

A       -- Mr. Sacco did that I believe he did not do

to any other employees.

Q      Okay.  What are those?

A      All right.  Several of the documentations, the 3971s that were under -- that I would write FMLA, and you don't get those -- you don't get the FMLA papers to sign until after they go through the MDA. And several of them he would write RTS on them and I had not even seen them.

Q      What does RTS signify?

A      Refuse to sign.  And another thing what I believe is because he was -- had to do with my racism, I was wondering why he wouldn't give me the jobs according to my seniority as he would opposed to the other white employees.

Q      And these are the jobs we were talking about when you wouldn't get the level 5 job and somebody else would?

A      Yes.  Or when I did get the level 5 job but, like I said, there was one other job that I qualified for to do and I would get the lower part of the job.

Q      Okay.  Who got the higher part of the job, do you remember?

A      As when I did apply for it?

Q      Yeah.

A      He would pick people off the list.

Q    Okay.

A    Off the driving list, when I actually had the job to be driving.  The person that has the job over -- goes over all the people that are on the list.  And it wasn't like a matter where he say, look, this guy doesn't know this job, can you do this because he doesn't know this, these were the same people that were just as qualified as I was.

That's basically everything I have.  That's basically everything I have.

MR. RICE:  Okay.  Thank you very much, Mr. Wylie.


(Defendant's Exhibit 1:

Marked for identification.)


(Deposition concluded at 12:13 p.m.)

STATE OF CONNECTICUT

I, KRISTINE A. PARADIS, LSR 338, a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Notice, there came before me on the 31st day of March, 2004, the following named person, to wit:  KEITH C. WYLIE, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this _13th_ day of _april_ , 2004.

_Kristine Paradis_

KRISTINE A. PARADIS, LSR
Licensed Shorthand Reporter

My Commission expires:
    May 31, 2008

<u>INDEX</u>

WITNESS                                                    PAGE

Keith C. Wylie


<u>DEFENDANT'S EXHIBITS</u>

(For Identification)

<u>EXHIBIT</u>                                                 <u>PAGE</u>

  1        Report of Investigation,
           USPS Case No. 1B-065-0055-01        88


Reporter's note:   Exhibits retained by
                   Attorney Rice.

JURAT

```
- - - - - - - - -x
KEITH C. WYLIE,              |
     Plaintiff,              |        Docket NO.
                            |        3:03CV00426 (JCH)
     vs.                    |
                            |        March 31, 2004
JOHN E. POTTER,             |
Postmaster General,         |
     Defendant.             |
- - - - - - - - -x
```

          With the addition of the changes, if any,
     indicated on the attached errata sheet, the
     foregoing is a true and accurate transcript of my
     testimony given in the above-entitled action on
     March 31, 2004.


                    _____

                         Keith C. Wylie


Subscribed and sworn to before me, the undersigned
authority, on this, the _____ day of
_____, 2004.


                    _____

                         Notary Public


My Commission expires:

kap

ERRATA SHEET

The ORIGINAL JURAT and ERRATA SHEET must be notarized (even if there are no corrections) and returned within 30 days of receipt to the attorney who took the DIRECT EXAMINATION.  All other counsel of record must be sent a COPY, along with a COPY to our office for our records.

Page    Line        From                To

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____

  Date                        Keith C. Wylie

Sworn to before me this _____ day
of _____, 2004.

                        _____

                          Notary Public

My Commission expires: _____

kap